**UNITED STATES, to Use of FORSBERG v. FLEISCHMANN CONST. CO. et al.**

(District Court, E. D. Virginia. August 4, 1923.)

1. United States &cm;74½⧵ New, vol. 12A Key-No. Series—Creditors could file claims in suit against public contractor within one year after final settlement with government, notwithstanding time of completion of work.

     Under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), providing that no suit shall be brought by a laborer or material-man against a contractor, who has a contract with the United States government, and his surety, "until after the complete performance of said contract and final settlement thereof," and that where suit is so instituted "any creditor may file his claim in such action and be made a party thereto within one year from the completion of the work under said contract and not later," creditors could file their claims within one year after

the final settlement of the contract with the government, regardless of when the construction of the work was completed.

2. **United States ☞74½, New, vol. 12A Key-No. Series—Petitions of claimants in suit, against public contractor amendable after expiration of year for suing.**

Laborers and materialmen, who filed claims in suit against public contractor under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905, (Comp. St. § 6923), within one year after the contractor's settlement with the government, could, in the discretion of the court, amend their petitions after the expiration of such year.

3. **United States ☞74½, New, vol. 12A Key-No. Series—Claimant in action against public contractor required to show that materials and labor were applied under contract.**

In action against public contractor and his surety under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), by a subcontractor of subcontractor of general contractor, the claimant was required to show that the materials and labor comprising the account had gone into the construction, under the contract with the government.

4. **United States ☞74½, New, vol. 12A Key-No. Series—Claim allowed in action against public contractor, notwithstanding claimant's failure to show itemized account of materials furnished.**

In suit, against public contractor and his surety under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), in which there was no charge of collusion between subcontractor and claimant, who was a subcontractor of such subcontractor, in which there was no attempt on the part of the principal contractor and his surety to prove that the amount of claimant's contract did not fairly represent the cost of labor and materials for which claim was made, and in which there was uncontradicted evidence that claimant made a mistake of $300 or $400 in his bid price, the court will allow the claim, notwithstanding claimant's failure to show an itemized account of the materials furnished, because no separate account was kept.

5. **United States ☞74½, New, vol. 12A Key-No. Series—Claim allowed in action against public contractor, though part of itemized account made up of trade acceptances.**

In action against public contractor and his surety under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), a claim for material will be allowed, though a part of the itemized statement of account is made up of trade acceptances, where claimant's testimony showed that the materials represented in the bill for which the trade acceptances were given were actually furnished and used in the work, and no attempt was made by the principal contractor and surety to prove the contrary.

6. **United States ☞74½, New, vol. 12A Key-No. Series—Principal contractor, sued under Heard Act, held to have right of set-off as against subcontractor's assignee, who filed claim.**

If delay in completion of public contract was the fault of a subcontractor, and the principal contractor sustained damages by reason thereof, the principal contractor had a legitimate set-off, which could be urged in action against principal contractor and his surety in action under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), in which the subcontractor's assignee filed a claim.

7. **United States ☞74½, New, vol. 12A Key-No. Series—Principal contractor, claiming set-off against subcontractor's assignee in action under Heard Act, had burden of proof.**

In an action against a public contractor and his surety under Heard Act Aug. 13, 1894, as amended by Act Feb. 24. 1905 (Comp. St. § 6923), the principal contractor, to avail itself of a set-off against subcontractor's assignee because of damages due to delay caused by subcontractor, had the burden of proving such damages.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. **United States ⬳74½, New, vol. 12A Key-No. Series—Claim could be filed in action against public contractor by subcontractor's assignee in own name or that of assignor.**

In action against public contractor and his surety under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), subcontractor's assignee could file claim either in its own name or subcontractor's name.

9. **United States ⬳74½, New, vol. 12A Key-No. Series—Subcontractor's claim allowed in action against public contractor, though item therefor not included in principal contract.**

Where contractor, constructing a torpedo assembly plant for the United States government, let subcontract for certain work after submission to and approval by the government, and the contractor was paid therefor as an extra, the subcontractor could file a claim therefor in an action against the contractor and his surety under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), though the item was not included in the original contract between contractor and government.

10. **United States ⬳74½, New, vol. 12A Key-No. Series—Subcontractor, doing extra work ordered by government at cost, held entitled to difference between amount allowed by government and cost.**

Where the United States government ordered that certain work be done as an extra, and the general contractor contracted with a subcontractor for the performance of such work for the account of the general contractor at actual cost, the subcontractor was entitled to the profit, where the amount allowed by the government exceeded the cost.

11. **United States ⬳74½, New, vol. 12A Key-No. Series—Interest allowed in action under Heard Act against general contractor from filing of suit and interventions.**

In action against public contractor and surety under Heard Act Aug. 13, 1894, as amended by Act Feb. 24, 1905 (Comp. St. § 6923), in which many of the contracts sued on were with a subcontractor of the main contractor, and there were honest differences as to amounts due, interest will be allowed from the date of filing of the original suit and the interventions, respectively.

At Law. Action by the United States, to the use of G. W. Forsberg, against the Fleischmann Construction Company and another, in which Henry A. Kries & Sons and others intervened. Judgment for plaintiff and interveners.

Judgment affirmed 298 Fed. 330.

Bynum E. Hinton, of Washington, D. C., for interveners.

Caton & Caton, of Alexandria, Va., Levi David, of Washington, D. C., and William F. Kimber, of New York City, for defendants.

GRONER, District Judge. This action was brought to enforce liability of the defendants, as contractor and surety, respectively, under the provisions of the statute of February 24, 1905 (33 Stat. 811 [Comp. St. § 6923]), amending the Act of August 13, 1894 (28 Stat. 278) commonly known as the "Heard Act." The record is very voluminous, the interventions very numerous, and it was apparent to the court and to counsel, when the case was ready for trial, that it would be a matter of very serious inconvenience to all concerned to attempt to complete the entire case at a single session of the court. The convenience of witnesses and the time of counsel were therefore considered by the court as justifying, with the consent and at the suggestion of all parties,

a reference of the case to a special master to take the evidence and find the facts, and then, by stipulation of counsel, the evidence, together with the master's finding, was to be reported to the court, and the whole matter of law and facts submitted to the court without the intervention of a jury.

It is sufficient for an understanding of the case to say that the Fleischmann Construction Company entered into a contract with the United States for the construction of the naval torpedo assembly plant at Alexandria, Va., on October 14, 1918, for the sum of $999,750. The National Surety Company became surety on the contractor's bond in the sum of $300,000. The contract reserved to the United States the right to make changes, alterations, and additions, the cost of which was to be determined by a government board.. Changes were made, new work was added, and these were known to the government as change orders 1 to 21, inclusive. Subsequently these orders were incorporated into a supplementary contract between the same parties, dated May 24, 1919, the price to be paid by the government being fixed at $199,160.07, and the same bonding company became surety in the sum of $59,748. Apparently additional change orders were from time to time issued, and were known as change orders A to F, inclusive. The master summarizes the contractual relation between the parties as obtaining under "contract No. 3425, supplemental contract No. 3425–X and change orders A to F, inclusive." The principal contractor, Fleischmann, sublet to a company known as the Premier Engineering Company a large' portion of the work. Many of the interventions passed on were for failure to pay for work done under the direction of this subcontractor.

[1] It is first insisted on behalf of the surety company that, except the claim of Forsberg embraced in the original action, all of the interveners filed their petitions in the suit too late, under the statute. The basis of this is the finding of the master that the work under the contract was completed February 5, 1920. Although the master finds that the work itself was completed on February 5, 1920, he likewise finds that the date of final settlement was October 1, 1920. Whether the conclusion of the master that the work was substantially completed on February 5, 1920, is justified by the evidence, it is, in my opinion, unnecessary to determine, for I think that date has no relation to the rights of the parties. The act provides that no suit shall be brought until six months from the completion and final settlement of the contract. Unquestionably the master was correct in ascertaining the date of the completion of the contract and final settlement with the government as October 1st. It follows, therefore, that no suit could have been brought until the 1st of April, 1921, and but one creditor is permitted, by the terms of the act, to bring the suit; the others being required to come in and file their petitions of intervention. If, therefore, the period when the work was completed is. fixed as of February 5th, and if that date controls the period of intervention, it follows that, except for one creditor, the rights of all the parties in interest would be foreclosed, because more than a year would have passed after February 5th before the expiration of the six months period from October 1st. The justification of this position on the part of the surety company grows out of the loose language found in the act, as follows:

"And provided further, that where suit is so instituted by a creditor or by creditors, only one action shall be brought, *and any creditor may file his claim in such action and be made party thereto within one year from the completion of the work under said contract, and not later.*"

The act itself has been passed on by the Supreme Court in a great number of cases, and the burden of all of these is that:

"The purpose of the act was to provide security for the payment of all persons who provide labor or material on public work. This was done by giving a claim under the bond in lieu of the lien upon land and buildings customary where property is owned by private persons. Decisions of this court have made it clear that the statute and bonds given under it must be construed liberally, in order to effectuate the purpose of Congress as declared in the act. In every case which has come before this court, where labor and materials were actually furnished for and used in part performance of the work contemplated in the bond, recovery was allowed, if the suit was brought within the period prescribed by the act. Technical rules otherwise protecting sureties from liability have never been applied in proceedings under this statute." Illinois Surety Co. v. John Davis Co., 244 U. S. 376, 37 Sup. Ct. 614, 61 L. Ed. 1206.

To hold, as the defendants would have me hold in this case, that the government could delay the period of final settlement, as apparently it did in this case, until all the claims under the bonds would be outlawed by limitation, would be exactly contrary to the purpose Congress had in enacting the law. The true construction of the act is that a suit must be brought within a period of a year after the final settlement with the government, and not less than six months after the same. The first period of six months is for the benefit of the government, to enable it to bring suit if it elects to do so. If it does not within the six months period, then the rights of the creditors of the contractor become effective from that time for a further period of six months, and the rights of the interveners, who are denied the right to bring separate actions, cannot be, upon any theory of the law, of lesser dignity than the claim of the principal claimant. They all grow out of the same statute, and all equally depend upon its terms for the ascertainment of their rights. The precise point was decided in London, etc., Co. v. Smoot, 287 Fed. 952, 52 App. D. C. 378, and the Supreme Court, in Bryant Co. v. N. Y. Steam Fitting Co., 235 U. S. 327, 35 Sup. Ct. 108, 59 L. Ed. 253, has called attention to the ambiguous language of the statute and to the duty of a court to give coherence to its provisions to accomplish the intent and purpose of Congress. There can be no doubt, I think, if this precise question is submitted to the Supreme Court, that it will hold that the time of all the creditors, both the plaintiff creditor and the intervening creditors, begins to run from the same event, to wit, final settlement.

[2] It is, however, insisted by the defendants that, if the defense hereinbefore mentioned is not available, the actions in this proceeding are barred by reason of the amendments to the petitions made after the expiration of the year. In answer to this position it is only necessary to say that the action was brought within the period of a year from the completion of the contract, and all of the intervening petitions were filed within the same period. After they had been filed, in nearly every instance—in fact, I think in every instance—they were amended in sundry

respects, but mostly in regard to the declaring on the supplemental contract referred to in the preliminary part of this statement. In my view of the situation, as disclosed by the record in this case, the two contracts were one and the same. The first contemplated that there would be extra or additional work, and the government reserved in that contract the right to eliminate work or to add work, and the bond executed to provide for the faithful performance of this contract and for the payment of laborers and materialmen for their part in the carrying out of the contract, was made expressly to cover any such changes as were ordered by the government.

The fact that the government embodied these change orders in another contract, and required the contractor and his surety to execute a new contract and an additional bond, in no sense of the word changes the situation. The supplementary contract upon its face shows that it was merely amendatory of the original, and provides that nothing therein shall be held to affect, modify, alter, omit, or vitiate any of the provisions or requirements of the original contract, and that nothing done or required to be done by virtue of its specific terms shall affect, reduce, or release the original bond. It also provides that the surety should be, and is, made a party to the supplementary agreement, for the purpose of extending the terms of the original bond to cover the changes provided by the government, and all of this was done precisely as recited above. The fact that an additional bond was given by the same surety does not change the situation in the slightest, nor does the fact that some of the work for which the claims in this case are filed was done under the original contract, and some under the supplementary contract, change the situation. The contractor and his surety, in both instances, were bound to respond to the claims of all persons supplying labor and materials in the prosecution of the work provided for in the contract.

The suit having been regularly and properly brought, and the intervening petitions having been equally regularly and properly filed, amendments at any time up to the trial of the cause were within the discretion of the court, and in these cases the court, in the exercise of that discretion, allowed the amendments to be filed. The fact that they were filed more than a year after the final settlement does not put them outside of the terms of the statute, but makes them rather to relate back to the time of the bringing of the original action or the filing of the original petition. The points raised, therefore, which may be described as technical, are overruled, and the court will now proceed to discuss the specific objections made to the claims, respectively.

### Claim of G. W. Forsberg.

[3, 4] The master allowed this claim for $1,094. The proof shows that this intervener was a subcontractor of the Premier Engineering Company, itself a subcontractor of the Fleischmann Construction Company. The amount of his contract was $1,094. He duly proved the contract, and that the work was done and accepted pursuant thereto. To meet the point that it was necessary to show the actual work, for materials and labor comprising the account, had gone into the construc-

tion under the contract, evidence was produced on behalf of the intervener to show the cost of the labor supplied by him on account of the contract to be $811.25. He was unable to show an itemized account of the materials furnished; his explanation of his failure in this regard being that no separate account was kept of them, but that the same could be readily figured from the drawings and specifications made a part of the contract. This information was equally available to either side. No attempt was made to contradict the evidence of the witness that the amount of the materials over and above the cost of the labor was actually in excess of the contract price, and that a loss to the intervener ensued as a result of this contract. No charge of collusion between the Premier Company and intervener is made, and there was no attempt on the part of the defendants to prove that the amount of the contract did not fairly represent the cost of the labor and materials for which intervener now claims a right to proceed in this action. In the absence of such proof, and particularly in view of the uncontradicted evidence that intervener made a mistake of $300 or $400 in his bid price, I think there can be no doubt that the master was right in recommending that judgment be allowed for the contract price.

### Claim of Hersey Manufacturing Company.

The master allowed this claim for $970.95, in which respect his action is approved.

### Claim of E. G. Schafer & Co.

[5] The amount of this claim is $696.65. Petitioners claim to have furnished material to the value of $2,725.51, and to have received in payment $2,028.86. Objection is made to the allowance of this claim on the ground that a part of the itemized statement of account is made up of two trade acceptances, one for $878.94 and the other for $504.-84, and the itemized list of materials furnished, amounting to $1,-341.73. The explanation of the petitioners as to the trade acceptances in the itemized account is that these represented items for materials furnished prior to the dates on which the acceptances were respectively made and delivered, and balanced the account as of those dates; that they were for goods delivered to the job prior to June 3, 1919, as to the $878.94 item, and prior to August 1, 1919, as to the $504.84 item. When they were unpaid by the maker, they were charged back to his account, and appear in the statement. To understand this is not difficult. The items embracing the account of June 3d were figured, the account rendered, and the correctness of the same determined by the delivery of the trade acceptance for the amount of the account. Petitioners, instead of carrying the items, therefore, on the books as an open account, to await the payment of the trade acceptance, closed the account with the trade acceptance, and, when subsequently this was unpaid, charged them back to the account.

Of course, a trade acceptance for something else than materials furnished for use under the contract in issue would not be a proper subject for allowance in a claim of this character; but the testimony of the witness is that the materials represented in the bill for which the

trade acceptance was given were actually furnished and used in the work for which the bond in this case was given. No attempt was made by the defendants to prove the contrary. The information was equally available to them, and, if there had been any doubt about the correctness of the bill, it was not unfair to assume that there would have been some attempt on their part to deny the evidence in its behalf; but in the absence of such evidence, and in view of the evidence for the claim, it seems to me it would not be fair nor just to deny the right of petitioners to a recovery. Particularly is this true, and especially is it inapt to say that there is any failure of evidence, when it is considered that the trade acceptances, though included in the account, were subsequently paid and delivered up, and credit for these payments shown on the account, so that it really would have been correct bookkeeping to have eliminated the trade acceptances from the account altogether, and this would have eliminated the corresponding amount of payment which is allowed in the account, and, as corrected, the account would have shown the amount now claimed, which the court thinks should be, and is, allowed.

### Claim of Worthington Pump & Machinery Corporation.

The master allowed this claim for $2,499. The only objection to the claim is that the deposition of one Finney was taken in support of it. Notice of the taking of depositions was duly given in accordance with the proper practice, and this witness was cross-examined by counsel for the defendants, without objection to the failure of the notice to name the person whose deposition was to be taken. In addition to this, his evidence was not necessary to a proof of the claim; the claim having been proved without his testimony. Hence the point as to his testimony is overruled, and the claim allowed in accordance with the report of the master.

### Claim of Albert T. Otto & Sons, Inc.

[6, 7] The intervener in this case, whose claim arises out of an assignment from the Keppler Glass Construction Company, Inc., subcontractors of the Fleischmann Construction Company, one of the defendants herein, filed a claim amounting to $4,344.52. The master allowed it $2,884.96; the deduction, amounting to $1,459.56, being set out in detail in his report. An examination of the evidence satisfies me that he is correct in these deductions, except that I am unable from the evidence to account for his failure to allow as an offset the whole amount of the claim for work done on vault lights, as proved by the Fleischmann Company, amounting to $408.08. The master has fixed this figure at $343.99. It is possible that he is correct, but such examination of the records as I have been able to make satisfies me that the amount should be $408.08, or a difference of $64.09, which should be deducted from the amount allowed by the master. The claim, therefore, as allowed for judgment by me, will be $2,820.87. Other objections to items, made by the defendants, I think are without merit.

Still another objection, more serious, is that the contract of the assignor of this intervener with the Fleischmann Company provided for the work to be completed by November 13, 1919, whereas it was not

completed for a very considerable period after that time. The government's contract with the Fleischmann Company provided for liquidated damages for delay, on the basis of $500 for each day, and the government actually charged the Fleischmann Company $42,000 for the delay in the completion of the work. In the contract, however, between the Fleischmann Company and the Keppler Company, assignor of intervener, article 8 provides that, in case of delay caused either by the contractor to the subcontractor or the subcontractor to the contractor, the party causing the delay shall reimburse the other for the loss caused thereby. This definitely fixed the rights of the parties. If the Keppler Company was at fault in a delay in the completion of its work, and the Fleischmann Company sustained damages by reason thereof, it follows necessarily that the latter had a legitimate set-off, which could be urged and allowed here; but the record fails to disclose that it sustained any damage by reason of the delay. It was certainly not up to the Keppler Company or its assignee to prove a negative. On the other hand, it must be true that the obligation of proving damages rested throughout on the defendant. Either there were no damages, or it failed to prove them. In either case the result is the same.

[8] A further ground of objection to the allowance of this claim is that there was no interest on the part of intervener. The answer to this is that it showed a valid, subsisting assignment, transferring to it all the title, right, and interest of the Keppler Company. The rights as between itself and the Keppler Company are matters in which these defendants have no interest. A judgment in the present action is conclusive against the Keppler Company and its assignee, Otto & Sons, Inc. Otto & Sons, Inc., as assignee, might have sued in its own name, or in the name of the Keppler Company, and the assignment, in a proper legal form, being shown, the amount of consideration paid on account of it was of no consequence in this behalf.

The amounts allowed by the master to the other interveners, namely, Henry A. Kries & Sons, Wallace & Gale, Warren Webster Company, Walworth Manufacturing Company, S. S. Glassgold & Co., Pierce, Butler & Pierce, Structural Slate Company, Wade Iron Sanitary Manufacturing Company, Beaton Cadwell Manufacturing Company, Columbus Brass Company, Goulds Manufacturing Company, Dimock & Fink, Savage Exp. Bolt Corporation, and McNab & Harlin, are not objected to, and are therefore allowed for judgment in accordance with the report of the master. This leaves only the claim of the Carroll Electric Company.

[9] The Carroll Electric Company was a subcontractor of the main contractor, the Fleischmann Construction Company, defendant. The master, in his original and supplemental reports, allowed on the original contract and extras $16,405.63, and another item, for filtering oil ordered direct from the Fleischmann Company, $1,037.74, making a total of $17,443.37. Objection is made to two of the items making up this account, namely, the $1,037.74 item for filtering oil, and the allowance under change order 21, item 1–E, amounting to $5,366.13. The objection to the filtering oil item is that it was not included in the original contract, and did not add anything of value to the public im-

provement. The item was ordered by the Fleischmann Company direct, after submission to the government board and approval by it, and was allowed Fleischmann as an extra, and paid by the government to Fleischmann. I see no point in the objection to this item. The work done enabled the switchboard, converters, etc., which were furnished by the government as a part of the construction work, to operate properly. The government ordered the work, under its right to change the contract, and paid for it in accordance with the terms of the contract. The Carroll Company, against the demand of the Fleischmann Company, supplied this. It did the work, and is entitled to payment to the same extent that the Fleischmann Company was entitled to its payment from the government. Change order 21, item 1–E, in which $5,366.13 is involved, is reported by the master as follows:

"It is evident that the Carroll Electric Company was the subcontractor for the work to be done under change order 21, item 1–E, and remained as such until the completion of the contract."

[10] The master further finds that the Fleischmann Construction Company, finding it convenient to do this work itself, agreed with the Carroll Company to do it for the account of the latter, and at actual cost. He also finds that the Fleischmann Company performed the work and collected the allowance made by the government on account thereof, and that the difference between the actual cost of the work and the amount of the allowance by the government was the amount allowed by him to the Carroll Company, namely, $5,366.13, which amount was the profit on the job. The evidence shows that the work was ordered by the Navy Department as an extra; that the Fleischmann Company thereafter contracted with the Carroll Company to do the work. This fixed the rights of the parties as between themselves, and, unless the Carroll Company voluntarily surrendered some of its rights in the contract, they continued throughout. It did agree, at the instance of defendant, to have the work done for its account at cost, and apparently this was thoroughly understood between the parties, because, when the work was completed, the Carroll Company was billed accordingly, and it was only after the work was surveyed and the government's allowance made, which showed the profit, that the Carroll Company's rights to the profit were questioned. It is only necessary to state the converse of this proposition to show that it was without merit; that is to say, if, in the doing of the work, the cost had been greater than the government had allowed, the loss would, unquestionably, have fallen on the Carroll Company. This being true, it follows that the profits of the contract were equally its own. The Carroll Company has itself excepted to the master's report in some small detail, particularly with regard to the allowance by the master for items 3–E and 4–E.

The difference between the amount allowed by the master and the amount shown to have been paid by the government, covering these extras, is $194.15. For reasons already stated, it is apparent that, under the terms of the contract between the main contractor and the Carroll Company, the latter was entitled to the amount the government allowed for the extra work done by it. The method of procedure under

these contracts is: The government orders the main contractor to do certain work, and the contractor is obligated under his contract to do it. When it is done, or while it is in process of being done, a board of officers appointed by the government determines the amount to be paid for it, and the contractor is bound by this determination. The estimate of the board is the actual value of the work, to which is added a profit to the contractor and a small percentage for overhead. These latter two items, the main contractor is entitled to. The actual allowance for the work, the man who does the work is entitled to. As to the two items in question, the Carroll Company did the work by designation of the contractor. The government made the award, and the amount of the award, not including the overhead and profit referred to, is $194.15 in excess of the amount allowed by the master. A correction, therefore, is made in the master's report accordingly.

[11] An extensive note has been filed by all parties as to the interest which should be allowed. I have given careful consideration to the argument on this subject, but, having regard to the fact that many of the contracts sued on here were with a subcontractor of the main contractor, as well as the honest differences, as to which there were some, between the parties, it is not unfair to fix the commencement of the interest as of the date of the filing of the original suit and the several interventions, respectively.

Nothing has been said herein as to the claim that the suits in New York, brought by the several interveners, are a bar to the prosecution of this suit. The point is wholly without merit.