# UNITED STATES, for Use and Benefit of JOHNSON, v. MORLEY CONST. CO. et al.

## No. 1444–A.

District Court, W. D. New York.

Dec. 14, 1936.

McKay & Headley, of Rochester, N. Y. (Clarence W. McKay, of Rochester, N. Y., of counsel), for twenty-seven claimants.

Buchholz & O'Donnell, of Kansas City, Mo., and Dudley, Stowe & Sawyer, of Buffalo, N. Y. (Roy P. Ohlin, of Buffalo, N. Y., of counsel), for defendant Morley Const. Co.

Gibbons, Pottle & Pottle, of Buffalo, N. Y. (Frank Gibbons, of Buffalo, N. Y., of counsel), for defendant Maryland Casualty Co., also for Maryland Casualty Co. as assignee of various claimants.

Lansdowne & Lansdowne, of Buffalo, N. Y. (Robert J. Lansdowne, of Buffalo, N. Y., of counsel), for Earl L. Harrington, administrator with the will annexed of Moody L. Rupp's Estate.

Kenefick, Cooke, Mitchell, Bass & Letchworth, of Buffalo, N. Y. (William P. Stewart, of Buffalo, N. Y., of counsel), for Standard Acc. Ins. Co.

John Marshall Gorman, of Buffalo, N. Y., for J. S. Thorn Co.

Kennedy, Holland, DeLacy & Svoboda, of Omaha, Neb., and Stanley H. Montfort, of Buffalo, N. Y. (Edwin J. Culligan, of Buffalo, N. Y., of counsel), for Concrete Engineering Co.

James F. Kelly, of Buffalo, N. Y., and George Cushwa, of Baltimore, Md., for Maryland Casualty Co.

RIPPEY, District Judge.

The general contract of construction between the Government and the Morley Construction Company is dated July 23, 1932. Article 1 reads as follows:

"Article 1. *Statement of work.*—The contractor shall furnish all labor and materials, and perform all work required for constructing and finishing complete, at Veterans' Administration Hospital, Batavia, New York, Main Bldg. #1, Dining Hall and Attendants' Quarters Bldg. #2, Recreation Bldg. #4, Nurses' Quarters Bldg. #5, M. O. C. Residence Bldg. #6, two officers' Duplex Quarters Bldgs. Nos. 7 and 8, Laundry Bldg. #9, Storehouse Bldg. #10, Boiler House Bldg. #12, Garage Bldg. #13, Flagpole #14, Incinerator Bldg. #15, Sewage Pump House #17, Connecting Corridors Nos. 1-2 and 1-4, providing slate as specified under 'Roofing and Sheet Metal,' Section 21C, in lieu of shingle tile where shown on drawings, and providing tile wainscot 7'-O" high (including plaster-

ed walls and partitions above the wainscot) and quarry tile base as specified, in Dining Hall and Attendants' Quarters Bldg. #2 and Nurses' Quarters Bldg. #5 in lieu of enameled blocks and base; also Roads, Walks, Grading and Drainage in connection with these buildings, but not including Plumbing, Heating, Electrical Work and Outside Distribution Systems, Electric Elevators, Steel Water Tank and Tower, Refrigerating and Ice Making Plant and Zoolite Water Softening System, for the consideration of five hundred forty thousand three hundred dollars ($540,300.00) in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows: Specifications for Buildings and Utilities for Veterans' Administration Hospital at Batavia, New York, June 3, 1932, and the schedules and drawings mentioned therein; Addenda No. 1 dated June 28, 1932 and No. 2 dated July 1, 1932; as contemplated by Item I and Alternates (a), (b), (d–a), (d–b), (d–c) and (e) of the Contractor's proposal dated July 9, 1932; the Contractor's telegram dated July 12, 1932, and letter of acceptance dated July 23, 1932.

"The work shall be commenced within Ten (10) Calendar Days after date of receipt of notice to proceed, and shall be completed within Two Hundred Forty (240) Calendar Days after date of receipt of notice to proceed, except that Storehouse Building No. 10, Radial Brick Chimney, pipe tunnel, and sufficient work in Boiler House Building No. 11 to permit the installation of boilers and equipment will be completed 90 days prior thereto."

Article 4 authorizes the Government to make necessary changes in drawings and/. or specifications with increase or decrease of cost and/or difference in time in the event that subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications are encountered during the progress of the work.

Article 5, with reference to extras, reads as follows:

"Article 5. *Extras.*—Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order."

Article 6 (and provisions elsewhere in the contract) makes the Government the

sole judge as to whether workmanship and materials are such as are required by the contract and as to whether work is performed as required by the contract, and in the event of rejected workmanship or material or faulty or improper construction, the contractor is required to correct the work, replace rejected material, or make changes as directed, and segregate and remove rejected or replaced material at his own cost.

Under article 8 the contractor is required not only to give his personal superintendence to the work, but to have a competent superintendent, satisfactory to the Government, on the work at all times during the progress of the work, with authority to act for him.

Article 15, with reference to disputes, reads as follows:

"Article 15. *Disputes.*—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within thirty days to the head of the department concerned, whose decision shall be final and conclusive upon the parties thereto as to such questions of fact. In the meantime the contractor shall diligently proceed with the work as directed."

Payments under the contract were provided for in article 16. Partial payments were to be made as the work progressed at the end of each calendar month on estimates made and approved by the contracting officer less 10 per cent. on the estimated amount until final completion and acceptance of the work covered by the contract, except that any time after 50 per cent. of the work had been completed the Government might, if it saw fit, make any of the remaining partial payments in full. The final payment was to be made after completion and acceptance of all work required upon the presentation of a properly executed and duly certified voucher, after the contractor shall have furnished the Government with a release, if required, and after taking into consideration allowable deductions.

Ten Change Orders were made by the Government during the progress of the work, as authorized by the terms of the contract. These orders involve a decrease in the contract price of $403.16 and an increase of $3,579.19, thus leaving the total

contract price for the entire work at $543,476.03. Change Order E, under date of May 5, 1933, made a change on account of rock excavation discovered necessary during the progress of the work and contemplated and authorized by section 2(c) of the Standard Specifications for Earthwork of $89.10, increase on account of deep footing and trench excavation by hand, 8.10 cubic yards at $11 per cubic yard, and power shovel excavation of 226.45 cubic yards at $9 a cubic yard, amounting to $2,038.05, making a total increase in contract price of $2,127.15 on account of this item. Change Order I provided for an increase of $112.32, under date of September 16, 1933, on account of 12.48 cubic yards of rock excavation at $9 per cubic yard, in accordance with an agreement between the contractor and the Government under date of September 5, 1923.

On May 5, 1933, forty days' additional time were granted by the Government to complete the contract on account of the additional work required as specified in Change Order E, above mentioned, and on May 8, 1933, because of Change Order F requiring reconstruction of the foundations of the pump house in a new location in accordance with revised contract drawings and including additional cribbing and concrete and because of encountering quicksand, an additional time of twenty-five days was allowed for completion of the work; the contractor being allowed an additional sum of $995.45 for the work included in the above totals. The Government did not terminate the previous extension for an additional twenty days. Notice to proceed was given to Morley on August 19, 1932. With the extensions granted, the contractor had 325 calendar days within which to complete the work. This time expired July 19, 1933. The work was not completed until October 31, 1933.

The Government accepted the work as finally completed and approved final settlement on November 9, 1933, and the amount was audited and a check for final payment was issued to Morley on November 13, 1933, in the sum of $59,780.22. The Morley Company was unable to cash the check because the Government was restrained from paying the check on suit of the surety. No release was given by Morley as contemplated under the provisions of article 16(d) of the contract and none was required. Article 9 of the contract provided for damages for delay or failure to complete the contract within the time specified, but no such damages were exacted by the Government under that clause.

Under the provisions of article 8, Herbert F. Morley, president of the contractor, gave his personal superintendence to the work. The contractor also provided a competent superintendent by the name of Reimer, who was satisfactory to the Government and who had full authority to act for the Morley Construction Company and to bind it by any agreement made or act performed by him.

The Morley Construction Company executed and delivered its performance bond on or about August 1, 1932, in the penal sum of $275,000 with the Maryland Casualty Company of Baltimore, Md., as surety. Attached to and made a part of the bond was the contract above referred to. The defeasance clause of the bond reads as follows:

"Now therefore, if the principal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term of said contract and any extensions thereof that may be granted by the Government, with or without notice to the surety, and during the life of any guaranty required under the contract, and shall also well and truly perform and fulfill all the undertakings, covenants, terms, conditions and agreements of any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived, and if said contract is for the construction or repair of a public building or a public work within the meaning of the act of August 13, 1894, as amended by act of February 25, 1905, shall promptly make payment to all persons supplying the principal with labor and materials in the prosecution of the work provided for in said contract, and any such authorized extension or modification thereof, then this obligation to be void; otherwise to remain in full force and virtue."

The defendant Morley Construction Company filed an answer to the petition and put in a general denial as to some of the intervening petitions, but defaulted in pleading as to others, including the petitions of the labor claimants. Upon the trial it moved to dismiss the bill of complaint and all claims of interveners on the grounds: (1) That the court was without jurisdiction of the suit in that it was prematurely brought because "final payment"

of the amount due the Morley Company had not been made by the Government; (2) that there was nothing due Maude A. Johnson from the contractor at the time suit was brought; (3) that, inasmuch as the bill of complaint must be dismissed on the ground first above mentioned, all claims of interveners must fail; (4) that nothing was due the intervening claimants when suit was brought or when their claims were filed; (5) that the plaintiff and certain of the intervening claimants were paid the amount of their claims by the surety before the trial, and the surety may not recover in this action against the contractor either under the doctrine of subrogation or by virtue of assignments of their claims; and (6) that neither the plaintiff nor any of the interveners have established facts sufficient to constitute a cause of action. Except as to the claimants whose claims have been assigned to the surety, the surety joins in the motion to dismiss on grounds numbered (1), (2), (3), (4), and (6), above.

The action was begun on May 19, 1934, by Maude A. Johnson, doing business as Johnson Roofing & Sheet Metal Works, against the contractor and surety on the bond under the Heard Act (40 U.S.C.A. § 270). The plaintiff was a subcontractor. The contract between her and Morley provided that she should receive payment only as and when the Morley Company received its pay from the Government for work done and materials furnished by her. There was a similar provision in the contracts between Morley and other subcontractors as to the time when payment was due to the latter. The statute authorizes a cause of action in the form in which this one is brought in favor of subcontractors, laborers, and materialmen, and the time within which they must bring suit is limited by the statute to one year after the completion of the work and "final settlement" of the contract, but it may not be brought within the first six months of such period, which is reserved to the United States to sue on its own account. When one action has been brought, all other creditors must intervene therein within the same time limit [United States v. Rangely Construction Co. (D.C.) 288 F. 76], if they are to recover on the bond. The date of "final settlement" starts the statute running without regard to the date when the work was completed. United States v. Fleischmann Const. Co. (D.C.) 298 F. 320, affirmed (C. C.A.) 298 F. 330, affirmed 270 U.S. 349, 46 S.Ct. 284, 70 L.Ed. 624. The term "final settlement," as used in the statute, denotes the date of final administrative determination by the proper authority of the amount due, without reference to when final payment is made. Illinois Surety Co. v. Peeler, 240 U.S. 214, 36 S.Ct. 321, 60 L.Ed. 609; H. G. Christman Co. v. Michigan Gypsum Co. (C.C.A.) 85 F.(2d) 474. Thus, "final settlement" in the case at bar was on November 13, 1933, as appears from the voucher duly audited for final settlement. The action was thus brought within the period required by the statute.

It is true, if the action had been brought before the expiration of the six-month period reserved to the Government to sue on its own account or after the expiration of the one-year limitation, the court would be without jurisdiction to entertain the suit; in such a case, an amendment to the complaint would not cure the lack of jurisdiction; nor could the suit be maintained in behalf of interveners even though their intervention occurred after the end of the first six months of the statutory limitation of time and before its end. U. S. ex rel. Texas Cement Co. v. McCord, 233 U.S. 157, 34 S.Ct. 550, 58 L.Ed. 893. Under such circumstances, lack of jurisdiction depends solely upon the fact that the action was not brought within the time authorized by the statute. Here no such question arises. Summons was duly issued by the clerk of this court, dated May 19, 1934, and served on the defendant Morley Construction Company by a United States marshal at Kansas City, Mo., on May 28, 1934. The surety was served and all claimants intervened within the period of statutory limitation. The action was brought in time and the court acquired jurisdiction of the parties. The court also has jurisdiction of the subject-matter. The contract was performed within the Western District of New York. The suit is not for the balance unpaid on the contract. There is no fund in court. It is an action on the bond, and the territory of the entire United States and its possessions is, by statute, within the jurisdiction of this court to make its process effective. United States v. Congress Construction Co., 222 U.S. 199, 32 S.Ct. 44, 56 L.Ed. 163; Baker Contract Co. v. United States (C.C.A.) 204 F. 390. Having jurisdiction of the parties and the subject-matter in accordance with the statutory provisions (40 U.S.C.A. § 270), the court may render such judgment as to all parties involved as the merits demand. Purchase of the claims of plaintiff and in-

terveners by the surety after the action was duly commenced did not deprive the court of jurisdiction. Seaboard Surety Co. v. United States (C.C.A.) 84 F.(2d) 348, 350.

■ Neither the contractor nor the surety can succeed on their claim that nothing was due to the plaintiff or to other intervening subcontractors from the contractor at the time the suit was commenced on the ground that the Morley Company has not, in fact, received its pay from the Government. The fact that the final payment has not been made by the Treasurer of the United States to Morley is no fault of the Government nor of the plaintiff nor of the interveners. The check was duly issued to Morley by the Treasurer of the United States and accepted as final payment by Morley. He deposited it for collection in the Merchants Bank of Kansas City on November 22, 1933. The only reason it has not been cashed is that, upon application of the defendant surety, the Treasurer of the United States has been restrained by the court from paying the amount to Morley. If creditors are to be held up by a quarrel (real or feigned) between the contractor and the surety on the question of which shall get the money, they may be forever barred from recovery. The Government was bound to pay the final amount due on the contract from November 13, 1933, and was and is willing to pay and attempted to do so.

■ The Morley Company claims, as above indicated, that the surety may not have judgment against it on account of claims of interveners assigned to it during the pendency of this action. It cannot base this claim for dismissal on the ground of payment. Payment is an affirmative defense and must be pleaded. Kalloch v. Hoagland (C.C.A.) 239 F. 252. The contractor has not pleaded payment. It cannot otherwise successfully maintain this claim. The surety is entitled, under the doctrine of subrogation, to recover against the Morley Construction Company for any moneys it may have paid to the subcontractors, laborers, and materialmen under compulsion. Ætna Life Insurance Co. v. Middleport, 124 U.S. 534, 8 S.Ct. 625, 31 L.Ed. 537. 60 C.J. 740, 744. There are at least thirty of such payments, exclusive of those that the surety may later be required to pay at the end of this litigation. The surety does not rely on the doctrine of subrogation, however. If that doctrine were invoked, it might be held that the litigating claimants have superior equities (Jenkins v. National Surety Co., 277 U.S. 258, 266, 48 S.Ct. 445, 446, 72 L.Ed. 874), or that the decision of Judge Knight (later referred to) is controlling. It relies, as to those payments already made, on assignments of claims secured during the pendency of this action. Under its bond, the surety is liable up to the sum of $275,000. If all claims should be allowed herein, the total is less than the amount for which the surety is liable. The claims in question were assignable during the pendency of the action (Civil Practice Act N.Y. § 83; Fifth National Bank v. Woolsey, 31 App.Div. 61, 66, 52 N.Y.S. 827; Perry v. Levenson, 178 N.Y. 559, 70 N.E. 1104; Title Guaranty & Trust Co. v. Puget Sound Engine Works (C.C.A.) 163 F. 168, affirmed Title Guaranty & Trust Co. v. Crane Co., 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72) and may be prosecuted either in the name of the assignee or the assignor, and no valid reason exists why the surety defendant may not recover against the contractor, if the assignors are entitled to recover. The assignment did not affect the remedy. United States v. Rundle (C.C.A.) 100 F. 450, approved in Title Guaranty & Trust Co. v. Crane Co., 219 U.S. 24, 35, 31 S.Ct. 140, 55 L.Ed. 72. Such judgments cannot affect the amount of recovery by those litigating claimants who have not assigned their claims. The practical effect is to liquidate all claims involved in this suit, and prorating is neither necessary nor permissible. The assertion that the act does not in terms give any right to the surety to maintain an action against the contractor is not decisive of the right of the surety to have judgment in this action on the assigned claims. Certainly, if the facts warranted, the assignors could recover. If necessary to satisfy legal niceties, such judgments might be docketed by the surety in the names of the assignors. It would seem to reach the height of absurdity to say that assignees (other than the surety) might recover, while no recovery may be had on the claims, no matter how meritorious, solely because they have been assigned to the surety. The recovery in any event is on the bond. In any event the contractor is liable over to the surety. The insolvency of the contractor might otherwise preclude the surety from recovering anything at all.

■ The Morley Construction Company attempted to appear specially on the trial

388 .

to insist that the right of the surety to recover against it has already been determined in this case. On April 3, 1935, the Maryland Casualty Company served a complaint on the Morley Construction Company in which it demanded damages "for all loss and expenses incident to the obligation which rests upon the Maryland Casualty Company by reason of its bond or undertaking and for judgment against the Morley Construction Company, for the amount of all claims or demands, judgments or obligations found to rest upon it, together with all sums heretofore paid out by it by reason of its said obligation, and the amount of all expenses of the nature hereinbefore described which shall have been incurred by the said defendant Maryland Casualty Company." The Morley Construction Company appeared specially for the purpose of moving to strike out the pleading and to dismiss the alleged cause of action, and an order was entered by Judge Knight on December 6, 1935, striking out the complaint. The opinion of Judge Knight indicates that the complaint was stricken out on the ground that the surety could not bring an action against the principal under the provisions of the Heard Act (40 U.S.C.A. § 270). In so far as that cause of action is concerned, the decision of Judge Knight is the law of this case.

The defendant Morley Construction Company appeared generally and filed an answer on June 23, 1934, in which it admitted the allegations contained in paragraphs 1, 2, 3, 4, and 5 of the bill of complaint of Maude A. Johnson, but denied each and every other allegation of the complaint. Interveners were required only to file their petitions in due course; they were not required to serve other original process to recover against either of the defendants. U. S. ex rel. Texas Cement Co. v. McCord, 233 U.S. 157, 34 S.Ct. 550, 58 L.Ed. 893; McClamroch v. Southern Surety Co., 193 Iowa, 249, 187 N.W. 41. As to certain of the interveners who have assigned their causes of action to the Maryland Casualty Company, the Morley Construction Company also appeared generally and filed answers to the petitions of intervention. Judge Knight did not pass upon the question raised upon the trial by the Maryland Casualty Company that it is entitled to judgment on the intervening petitions based upon the assignments. That question is in no wise affected by Judge Knight's decision. The objection of the

Morley Construction Company to proof of claims of interveners at the trial and to the effect that recovery may not be had against it by the plaintiff or by the interveners must be overruled.

Standard government specifications were used for the purpose of bidding and for all purposes of the contract, made up by the Veterans' Administration Construction Service and approved by the President as of November 19, 1926. The contract, in the case at bar, provides that the contractor shall furnish all labor and materials and perform all work as required for the construction and finishing complete at the Veterans' Administration Hospital, Batavia, N. Y., of all the work required "in strict accordance with the specifications, schedules, and drawings, all of which are made a part hereof and designated as follows: Specifications for Buildings and Utilities for Veterans' Administration Hospital at Batavia, New York, June 3, 1932, and the schedules and drawings mentioned therein." The performance bond was in standard form and refers specifically to the contract and is conditioned for the payment by the contractor upon the performance and fulfillment of all the undertakings, covenants, terms, conditions, and agreements of the contract. There can be no question but that the specifications, in so far as applicable, were a part of the contract for the faithful performance of which the bond was given.

Paragraph 16 of the specifications provides that the rate of wages for all laborers and mechanics employed by the contractor or any subcontractor on the buildings covered by the contract should be not less than the prevailing rate of wages for work of a similar nature in the city, town, village, or other civil division of the state in which the public building is located, and that every person while performing work of a laborer or mechanic on the public work covered by the contract should be regarded as employed as a laborer or mechanic by the contractor or subcontractor, regardless of any contractual relationship alleged to exist between the contractor or subcontractor and such laborer or mechanic.

It is, of course, clear that the foregoing provision of the contract with reference to laborers is of no weight unless authorized by Congress, and at the outset the contractor and the surety claim that Congress had not authorized the insertion of any such clause in the contract. The

Act of March 3, 1925, relating to the construction of new hospitals or dispensaries (43 Stat. 1213, § 2, 38 U.S.C.A. § 436), provides that such construction shall be done in such manner as the President may determine. The Act of March 3, 1931 (46 Stat. 1494, § 1, see 40 U.S.C.A. § 276a), in effect at the time the contract of the case at bar was executed, provides that every contract in excess of $5,000 in amount, to which the United States is a party, which requires or involves the employment of laborers or mechanics in the construction, alteration, and/or repair of any public buildings of the United States shall contain a provision to the effect that the rate of wage for all laborers and mechanics employed by the contractor or any subcontractor on the public buildings covered by the contract should be not less than the prevailing rate of wages for work of a similar nature in the city, town, village, or other civil division of the state in which the public buildings are located, and a further provision that in case any dispute arises as to what are the prevailing rates of wages for work of a similar nature applicable to the contract which cannot be adjusted by the contracting officer, the matter should be referred to the Secretary of Labor for determination, and his decision thereon should be conclusive on all parties to the contract. On January 19, 1932, in order to effect the purposes of the foregoing acts, an executive order was issued by the President requiring that all contracts within the terms of the said act should contain a stipulation required thereby. There can scarcely be any question that the clause in the contract relating to the payment of the prevailing rate of wage was inserted therein by the authority and requirements of the acts of Congress above referred to.

On September 22, 1932, the Director of Construction wrote the contractor fixing the wages of the various classes of laborers to be employed in the work to be performed under the contract as the prevailing rates at Batavia, N. Y., and directed that in accordance with the provisions of its contract, based upon the Act of March 3, 1931, and the executive order of January 19, 1932, it see that the wages paid by it or its subcontractors on the project were not less than those listed, and that it post those wage rates in a prominent and easily accessible place at the site of the work so that such list might be seen at any time by persons engaged on the work. The con-

tractor duly posted the rates specified. The Secretary of Labor, on October 14, 1932, adopted the rates fixed by the Director of Construction as the prevailing rates for Batavia, N. Y., and directed him to forthwith notify the Morley Construction Company to put those rates into effect without further delay. Such a notice was received by the contractor. The contractor complied with the order and posted the rates as directed.

On November 28, 1932, the Morley Construction Company entered into a contract with D. Giamberardino & Son for the furnishing and payment by the subcontractor of all labor as called for on the plans and specifications, of which the contract of the Government was made a part. The subcontract provided for supervision by the contractor to see that the wages were paid in accordance with its terms and for severe penalties for failure of the subcontractor to comply.

At or about that time or later, the subcontractor employed the various laborers who are now making claims in this action, and they worked for varying periods on the job, but never received the prevailing rates as fixed by the Secretary of Labor and posted by the contractor. These claimants variously testified that the subcontractor, at the time of their respective employments, agreed to pay them the prevailing rate of wage as posted. The defendants, on the other hand, introduced evidence to indicate that the men were not employed at the job but, rather, at the subcontractor's place of business in Rochester, N. Y., and that the subcontractor advised the men that he would be unwilling to take the contract at the prevailing rate of wage and that they agreed to go to work at a lower rate. The subcontractor asserts that he took his contract on the basis of that understanding with the laborers and made a bid much lower than he could otherwise have made. Upon the whole record, it must be held that there was no agreement between the contractor and these laborers at the time they went to work that they should receive the specified prevailing rates. The evidence also discloses that the contractor was aware of the fact that there was no such agreement made and acquiesced in it prior to the time that the subcontract was let. All the laborers understood, however, after they went to work, that they were to receive the rate of wages as posted.

▆ There came a time in January, 1933, when these laborers signed a statement to the effect that they had received their pay in full for all of their work during a period between December 9, 1932, and January 14, 1933; another statement was signed by them indicating that they had received their pay for the period from January 14, 1933, to February 11, 1933, in full for all work performed; a third statement was signed by them indicating that they had received their full pay for the period from February 11, 1933, to March 9, 1933. The men testified variously that these papers when signed were blank papers, that the papers were folded in such a way that they did not see them in their entirety, and that it was represented to them by the subcontractor that it was necessary for them to sign in order to show that they were American citizens. The excuse that was furnished that they were induced to sign the papers so as to show that they were American citizens is unworthy of credit. There was credible evidence to the effect that the statements in the papers over the signatures of these men were on the papers at the time the signatures were made, and it must be so held. They were advised and knew that the papers were to be shown to the Morley Construction Company to enable the subcontractor to secure moneys from the contractor. The conditions under which a signer of a written instrument is bound by its terms are succinctly stated in Pimpinello v. Swift & Company, 253 N. Y. 159, 170 N.E. 530, 531, where it is said: "Ordinarily, the signer of a deed or other instrument, expressive of a jural act, is conclusively bound thereby. That his mind never gave assent to the terms expressed is not material. * * * If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him. * * * If the signer is illiterate, or blind, or ignorant of the alien language of the writing, and the contents thereof are misread or misrepresented to him by the other party, or even by a stranger, unless the signer be negligent, the writing is void."

No inference is warrantable that they did not know what they were signing or what the purpose was for securing their signatures. None but Van Duser and Marcus Bonsignore objected to the failure of the subcontractor to pay the prevailing rates until the strike on or about April 11, 1933, and no claim is made by any of them for work after that date. No reason appears why they should not be bound by those statements and the defendants relieved from any further payments for the periods covered thereby, unless they are protected by the terms of the contract and the action of the Secretary of Labor, or the defendants are not in a position otherwise to bar the claimants from recovery.

On April 14, 1933, the same claimants executed another paper, and it must be held upon the whole record that they knew what they were signing at the time. In that, they certified that they had been paid in full for all work performed by them at the prevailing wage scale of $1.25 per hour for the plasterers, 50 cents per hour for the hod carriers, and 40 cents per hour for the laborers, and they specifically released both the contractor and the subcontractor from any and all claims which they had or might have on account thereof.

About that time a labor union made an investigation and called a strike, as a result of which the Department of Labor made an investigation and directed the contractor and subcontractor to pay the difference between what had been paid and the prevailing rates as posted to all those who had not signed the foregoing instruments. The defendant surety company asserts that, on the strength of the instruments signed by the claimants and to avoid further strike and the imposition of a possible penalty by the contracting officer, it advanced something over $5,000 with which to make such back payments.

We thus have these wage claims by laborers who (1) receipted in full for all amounts due, and (2) released the subcontractor and contractor for any of such claims, and (3) received amounts actually paid without complaint, notwithstanding that they did not receive the amount of pay provided for in the contract or at the rates posted at the site, or which they understood they were to get. May they now, as a matter of law, have judgment for the difference between the amount provided for in the contract and the amount they received?

▆ There is no provision in the contract, the subcontract, the statute, or the executive order that makes an agreement between an employee and the employer void if it provides for less than the prevailing rate. This is so notwithstanding the claim of the interveners that paragraph 16 of

the specifications provides that every person employed shall be deemed to be a laborer or mechanic within the meaning of the contract, any agreement to the contrary notwithstanding. That provision prohibits a subterfuge, as by calling an employee a "water boy" or something else other than a laborer or mechanic. It did not make void a contract with a laborer or mechanic for less than the prevailing rate. Even if it were otherwise, Congress never authorized the making of a contract void under such circumstances. Congress might have done so (Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148), as it did do in 1935. Had Congress intended to make a contract void which provided for a rate of wage lower than the prevailing rate, it would have done so in express terms. The fact that it did made a contract for less than the prevailing rate void by the amendment of 1935 (49 Stat. 1012, 40 U.S.C.A. § 276a—2(b) is persuasive on the intended scope of the 1931 act. In view of the state of the law at the time of the enactment, the laborers who signed the receipts and the release might have waived their right to the prevailing rate. Ryan v. City of New York, 177 N.Y. 271, 69 N.E. 599; People ex rel. McLaughlin v. Police Commissioners, 174 N.Y. 450, 67 N.E. 78, 95 Am.St.Rep. 596; Clark v. State, 142 N.Y. 101, 36 N.E. 817; Wright v. State of New York, 223 N.Y. 44, 119 N.E. 83; Byrnes v. City of New York, 150 App.Div. 338, 134 N.Y.S. 759; Pitt v. Board of Education, 216 N.Y. 304, 110 N.E. 612. But here the Government, for purposes of its own and as a matter of public policy, within its rights as above indicated, saw fit to require, as one of the conditions of the contract, the payment of the prevailing rate of wage, as conclusively fixed by one of its agencies. It is now, as the real plaintiff in this case (U. S. Fidelity Co. v. Kenyon, 204 U.S. 349, 27 S.Ct. 381, 51 L.Ed. 516), suing to enforce that contract, the provisions of which it has not waived. It is immaterial that the laborers are benefited by being permitted to recover unpaid wages at the prevailing rate. To deny this would be to allow individuals to nullify what Congress has deemed advisable in order to permit the United States when entering building contracts to attract competent and sufficient laborers and materialmen to carry on the work expeditiously.

 The rights of the laborers to receive the prevailing rate of wages were joined inseparably to the Government's rights under these provisions. The waiver by the laborers of the benefits they were entitled to did not relieve the contractor and the surety of the duty to perform, and it is immaterial with respect to the defendants in this action who receives the benefits of their performance, and consequently they cannot avail themselves of the defense of waiver unless they can show waiver on the part of all who were entitled to have the contract performed.

 There are additional grounds why the surety cannot bar the labor claimants from recovery. The surety stands in no better position with reference to its defenses than the contractor. United States v. National Surety Co. (D.C.) 20 F.(2d) 972, 975. Surely the contractor could not absolve itself from liability on the ground of payment or estoppel or waiver. The claimants were not paid the amounts they were entitled to receive. Both the principal and the surety knew that to be a fact. The statute, the executive order, and the contract required payment of the prevailing rate of wage which had been conclusively fixed by the Secretary of Labor before the men went to work. As a fact, concededly, this was not paid. The claimants cannot be barred from asserting their claims on the basis of estoppel. The defense of estoppel is based on the proposition that a party may be precluded by his acts or conduct from asserting a right to the detriment or prejudice of another party who, entitled to rely on such conduct, has acted upon it. Estoppel bars assertion of the truth by one who has knowingly induced another to believe what is untrue and to act accordingly. The evidence in this case establishes beyond doubt that the statements in the receipts and release were untrue and that the Casualty Company, as well as the principal, knew that the statements were untrue. It was fully familiar with the proceedings at the time of the strike and was advancing its moneys for the very purpose of enabling the Morley Company to pay to laborers who had not signed releases the difference between the amount they received for their work and the prevailing rate. The surety company knew that the claimants here were then making the identical claim that was made by the laborers who received this difference, to wit, that they had not been paid in full at the prevailing rate. It knew that the only reason the Labor Department did

not compel the contractor to pay to these claimants that difference was because of the release. Neither of the defendants was misled to its prejudice or into any altered position by virtue of the alleged release, and they were bound to know that they were not relieved from paying the prevailing rate of wage. They did not advance the money to pay the other laborers on the strength of the receipts and releases of the claimants here. The advance was made to settle the strike and enable the contractor to go on with the work. Neither was there any waiver by claimants of their rights. The Morley Company is in default in pleading and the surety company has not pleaded waiver. Waiver is an affirmative defense and must be pleaded. Oswego Falls Corporation v. City of Fulton, 148 Misc. 170, 179, 265 N.Y.S. 436. Neither can the surety reduce the amount of the claims on the ground that the prevailing rate of wages for work of a similar nature in Batavia, N. Y., where the buildings were constructed, was lower than the rate fixed by the Secretary of Labor. The contract and statute provide that the rate fixed by the Secretary of Labor shall be conclusive, and a most persuasive fact is found in the acknowledgment by the contractor before the laborers went to work of the right of the Government to fix the rate of wage to be paid under the contract and in its acquiescence in the rate so fixed.

█ It follows that claims made by the laborers as proven upon the trial in the aggregate face amount of $4,703.06, with interest, must be allowed, and their motions for direction of verdict as to the several amounts proven must be granted, and the motions of the defendants for a direction of verdict in their behalf must be denied.

█ The Concrete Engineering Company had two contracts with the Morley Construction Company; the first to furnish and to deliver to the job all steel window equipment complete, as called for under articles 18CA–1 to 18CA–13, inclusive, of the specifications, including amendments to 18CA, for the sum of $12,295.50 (including extras); and the second to provide the reinforcing steel and all labor and materials necessary to place and remove all removable steel forms for all joist forms required where open centering is used, for $27,548.63 (including extras). All materials required by both contracts were furnished. On the first contract there was paid or credited $8,165.06, leaving a balance

due of $4,130.44. On the second contract there was paid or credited $23,698.35, leaving a balance claimed to be due of $3,-850.28. Defendants claimed damages for delay in performance of the first contract. Defendants did not substantiate their claim, however, and could not recover, anyway, under the pleadings. The amount claimed must be allowed. This contract was sublet to the J. S. Thorn Company. On the second contract, the defendants claim they should have an allowance of $973.80 for damage to the concrete through the use of defective forms furnished by claimant. The written contract was not delivered until the work was substantially completed. It was drawn by the claimant and executed by it on August 1, 1933, and then delivered to Morley. The latter held it until December 10th, when it was returned to claimant without change, except as to items mentioned in the letter dated December 10, 1933, accompanying the contract, which provides that Morley will expect claimant to pay the expense of patching concrete required after removal of the forms. The claimant went ahead with his work, furnished the forms, and they were finally accepted and approved by the contractor and by the Government representative and were used to the exclusion of any others in the progress of the work, on the assumption that the contract would be signed by Morley. I am satisfied that the minds of the parties met on the terms of the written contract and that it embodied the entire agreement between the parties. When the forms were removed, the concrete was left badly honeycombed and rough, so that an extensive amount of refinishing by Morley was required. I am also satisfied that the evidence satisfactorily establishes that the honeycombing or roughing of the cement was not due to defective forms but was due to the character of the concrete mixture used by Morley and the removal of the forms before the concrete was thoroughly set, or improper tamping. Complaint was made when the forms were delivered that they were dirty, had hardened spots of concrete attached to them, were bent and dented, and were not greased. Thereupon, they were cleaned by claimant and put in proper condition for use. However that may be, the forms furnished were inspected, after cleaning, by the representative of the Government and approved and used by Morley prior to his delivery of the contract to claimant, and defendants are not now in a position to assert that there was any more

honeycombing and roughing of the cement shown after the forms were removed than would ordinarily show with the quality of the mixture used or to assert that the forms provided were not according to the contract. The claim for an allowance has not been sustained. If the forms were rough or pitted or otherwise defective as claimed, objection should have been made before they were used. It is too late to make that objection for the first time after the contractor has had the benefit of their use.

On August 16, 1932, a contract was entered into between the Morley Construction Company and the States Steel Construction Company whereby the latter agreed to furnish labor and material necessary in connection with the placing and installing of the reinforcing steel in the hospital building for $4,000. The subcontractor failed to perform, and the Standard Accident Insurance Company, who was surety on their bond, took over and fully completed the work, and claim is made for $4,227.60, the contract price plus extras, on which had been paid $3,128. The claimant was unable to prove on the trial, however, that there was a balance of more than $900 due. That amount was admitted to be due. On October 8, 1932, for value received, the subcontractor duly assigned this claim to the Standard Accident Insurance Company. The assignment was introduced in evidence and is absolute upon its face, and it appears that $1,200 was paid by the assignee to the assignor. The claim was assignable and the assignee may recover. Title Guaranty & Trust Co. v. Puget Sound Engine Works (C.C.A.) 163 F. 168, affirmed Title Guaranty & Trust Co. v. Crane Co., 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72. The counterclaim was stricken out of the answer by Judge Knight on motion, before the case came on for trial, and his decision on that question is the law of this case. The motion to dismiss because of the alleged variance between the pleading and proof must be denied. The variance is not material, but, if it were to be held material, the complaint must be deemed amended to conform to the proof.

The intervening petitions and claims of (1) Appalachian Marble Company, (2) M. N. Cartier & Sons Company, (3) Columbia Brass Company, (4) Cotta-lap Company, (5) Mike DiLillio, (6) John Filko, d. b. a. P & B Manufacturing Company, (7) Louis Forte, (8) Goodyear Tire & Rubber Company, Inc., (9) Reuben W. Gursslin Company, (10) Hy-Grade Petroleum Corporation, (11) Logan Company, (12) Joseph J. Luraschi and Alfred R. Pacini, (13) Manhattan Terrazzo Brass Strip Company, Inc., (14) Mosaic Tile Company, (15) National Cleaning & Tuck Pointing Company, Inc., (16) Wesley Norton, (17) Olean Tile Company, (18) Glenn I. Putnam, (19) Rochester Lead Works, Incorporated, (20) Walter B. Shore, (21) Structural Slate Company, (22) Swartout Company, and (23) Windsor Cement Company, Inc., are all dismissed, and an order to that effect may be entered. The petitions of M. N. Cartier & Sons Company, Rochester Lead Works, Incorporated, and Reuben W. Gursslin Company are dismissed on the ground that their claims are included within the claim of Maude A. Johnson, the use plaintiff. All of the other above petitions are dismissed on the ground that there is no evidence in the case warranting their allowance.

In the matter of the intervening petitions of (1) American Builders Supply Company, (2) American Hardware Corporation, Russell & Erwin Division, (3) American Terra Cotta Company, (4) Batavia Lumber & Coal Company, (5) Fred J. Burt, d. b. a. Fred J. Burt Company, (6) R. L. Carter Company, Inc., (7) Casey Carting Corporation, (8) Augusto Chiandoni, John Vitale, Rafaele Francoloni, and Mario Pandolfi, (9) Central Clay Products Company, Inc., (10) Decatur Iron & Steel Company, (11) Dravo Doyle Company, Dravo Equipment Division, (12) Genesee Lumber & Coal Company, Inc., (13) Genesee Stone Products Corporation, (14) Goldsmith Metal Lath Company, (15) George E. Hudson Corporation, (16) Harvard Tree & Shrub Service, (17) Lackawanna Steel Construction Corporation, (18) Martin New York Tent & Duck Company, Incorporated, (19) McPhillips Manufacturing Company, (20) Patton Clay Manufacturing Company, (21) Plamandon Gabriel Company, (22) Rochester Stationery Company, Inc., (23) Rust Engineering Company, (24) John Schutt, Jr., Inc., (25) Fred Salway, (26) G. A. Swenson, d. b. a. Swenson Stone Co., (27) Toledo Plate & Window Glass Company, (28) United States Gypsum Company, and (29) Maude A. Johnson, d. b. a. Johnson's Roofing & Sheet Metal Works, the use plaintiff, the claims have all been established by suf-

ficient and adequate evidence, in the aggregate amount of $66,881.33. An assignment was received in evidence of each of the foregoing claims to the defendant Maryland Casualty Company. In all except claims numbered (2), (9), (17), (19), and (24), above, stipulations duly executed were filed, authorizing the Maryland Casualty Company to prosecute such claims against the Morley Construction Company. Such a stipulation was unnecessary, because the assignments themselves authorized prosecution by the assignee either in the name of the petitioner or in its own name. As above indicated, the assignee may recover upon these claims against the Morley Construction Company, and the motions for directions of verdict in favor of the assignee must be granted. In the matter of the petition of the Casey Carting Corporation, a number of claims were involved. The claim was based on a contract with the Morley Construction Company on unit prices for hauling. Involved in that claim was one for a subcontractor Pottick, a subcontractor Turner Resilient Floors, Humphrey Craig, and one Palmieri. There was no evidence introduced to establish those claims, and the claim of the Casey Carting Corporation is allowed only at the sum of $133.75, and an order is directed entered dismissing that claim as to the others above mentioned.

Earl L. Harrington, as administrator of the estate of Moody L. Rupp, deceased, filed an intervening petition claiming $34,455.11 as a materialman. Rupp entered into a contract with the Morley Construction Company on August 5, 1932, whereby he agreed to do and pay for all of the work of excavating, stripping, and grading, and to furnish all labor and material necessary to do all outside concrete work, laying the roads, sidewalks, and so forth, in accordance with the plans and specifications of the contract between the Morley Company and the Government, including all concrete work except steps outside of the buildings, according to subsections 1–C and 34–C of the specifications. Under the contract he was required to do everything necessary pertaining to that work, incidental or otherwise, and to provide at his own expense all equipment, implements and apparatus, as necessary for the due performance of the work. The amount agreed to be paid for this work was $23,275, made up of an item of $8,875 for excavating, grading, and so forth, and $14,400 for concrete work. The amount to be paid was to be subject to additions and deductions as provided in the contract, one of which, contemplated by the contract, was in connection with the concrete work, and it was provided that this work was computed at $4.80 per cubic yard and was subject to an adjustment at completion for a greater or less amount, as might be determined by the actual measurements of the work in place, at that basic price.

Morley agreed to sell to Rupp all of the sand, gravel, and cement required for the work under the contract at the site of the buildings for the sum of $3.33 per cubic yard of completed concrete and to supply to Rupp without charge all other materials called for by the plans and specifications for the work, except the forms for the roads and sidewalks. The net contract price, including additions for concrete and deductions for materials furnished by Morley under the contract, was $13,432. Rupp received in cash $10,400. There were undisputed charge-backs of $41.50 for damage done by crane, of $73.60 for tree excavation required under the contract but not done, and of $20 for excavation for flagpole. Deducting the aforesaid cash payments and charge-backs, there would be a balance of $2,996.90 due under the contract.

Claimant admits credits for noncompletion, in addition to the above, aggregating $2,231.32, but defendants claim that this item should be increased to $10,154.90. Claimant also asserts that he is entitled to extras aggregating $13,631.20, and defendants claim that they are entitled to $5,800 as liquidated damages for failure to perform within the time fixed by the contract, at the rate of $100 per day. The items making up these various claims must be taken up separately. Defendants claimed that there was no substantial performance of the contract. The determination of that claim depends upon the decision as to matters which are to be severally taken up below.

█ (1) As to rock excavation. It was discovered during the progress of the work that rock excavation not contemplated by the parties to the main contract was required to be done. The Government ordered this work done by written change orders and agreed to pay Morley nine dollars per cubic yard. 298.93 cubic yards of rock were excavated, for which Morley was paid $9 per cubic yard. It is conclusively established by the evidence that Rupp did this excavating. Defendants

claim that Rupp was required by the terms of his contract to do this work without extra pay therefor. Upon the whole record, that claim cannot be sustained. There can be no question but that this work was an extra and that claimant is entitled to pay therefor. Subsection 10, paragraph 3(a), of the specifications provides that should rock, within the definition of the specifications, be encountered, it would be paid for as an extra. Rupp's engineer testified that Morley agreed to pay Rupp $6 per cubic yard for this work, and there is no substantial credible evidence to the contrary. This testimony must be taken as true, although, were it not for such testimony, claimant would be entitled to $9 per cubic yard as the reasonable value of the work, being the amount fixed by the contract between the Government and Morley and paid to Morley. This item must be allowed to claimant as an extra, and amounts to $1,433.58. There is no evidence that Morley was to retain any portion of that amount until the completion of the job, and he was entitled to the payment in full for that extra at the time Morley was paid.

(2) Claimant asserts that he is entitled to the sum of $1,072.13, being the reasonable value of services rendered by Rupp in removing débris from different portions of the site between July 18 and July 28, 1933. This débris was ordered removed by Morley and the representative of the Government. There was no agreement between Rupp and Morley as to payment for this work. Rupp did it under protest, claiming that it was not part of his contract to remove this débris, inasmuch as it was accumulated by Morley or other contractors during a period when Rupp was compelled by the Government inspector to stop the laying of concrete and while he was off the job during the cold weather. Before the work was done, there was considerable correspondence between the parties, and much testimony was taken on the question involved. It was apparently conceded that, while Rupp was off the job during the winter months, damage was done by trucking, and so forth, to the parts of the site where sidewalks and roadways were to be completed, and the parties agreed that Rupp should do the regrading necessary to repair this damage for the sum of $200. Morley asserted that his understanding of the allowance of $200 was that it was to cover the removal of any débris that had accumulated, while Rupp

claimed that that was not so but that the expense of removing such débris, together with the question of who should be required to remove it, was to be left to the representative of the Government for determination. Finally, Morley wrote to Rupp, saying that he would allow an additional $50 for removing the débris. In reply to this letter, Rupp stated that he was going ahead to do the work anyway, but would do it under protest, in the expectation that he would be allowed a reasonable sum for his services in removing such débris. Satisfactory evidence is lacking as to whether the accumulation of débris and damage to the side of the roadways and sidewalks was due to Rupp, or to his failure to properly protect his work against damage, as required by his contract. I am satisfied from the evidence and the concessions of defendants' counsel that $260 should be allowed to Rupp as an extra for the regrading and the removal of the débris and that this was payable as soon as the work was done. Connected with this claim there is an attempted charge-back by Morley of $127 for replacing pavement. The evidence satisfactorily establishes that the damage to the pavement was not caused by defective work on the part of Rupp but rather by trucks operated by Morley or other contractors, running over the concrete before it was properly cured, and this charge-back cannot be allowed.

(3) Claimant also asserts that he is entitled to recover the sum of $4875.39, for regrading the site due to mistake in level, of $3,055.50 for stripping off topsoil preparatory to regrading, and $2,619 for replacing topsoil after the regrading was done, all as extras. Under the contract, Rupp was required to grade the site according to the plans and specifications. The plans were a part of the contract. If the plans were defective, the owner and not the contractor is responsible. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166. The Government would not, in this case, be held responsible for any defects in the plans, because of the provisions in the specifications, section 1C, page 1C–1, paragraph 1 (b), and section 1G, page 1G–11, paragraph 31(c), which expressly provide that the Government does not guarantee the accuracy of the plans and that the general contractor must establish and plainly mark the center line of each building before ex-

cavating and maintain the center lines and permanently mark their locations, so that information would be at all times available to the contractor and subcontractor in connection with the work. The general contractor ·was also required to furnish to other contractors all elevations necessary within the building lines needed for the proper installation of the work under separate contracts. If the elevations of floors of the buildings had been established by the general contractor prior to the doing of any excavation or grading by Rupp, the latter might have been enabled to determine the proper elevations in this work. There appears upon the plan which was given to Rupp by the general contractor and which Rupp followed a certain monument on the east lot line of the site in question, marked 8–O. Immediately after Rupp had brought his machinery on the job, Rupp; his engineer, Reif; Herbert F. Morley, who was in charge of the work for the general contractor; his foreman, Rieman; a man by the name of Sparrow, who was connected with the business of the general contractor, and others—met on the site. A discussion occurred as to the point from which levels for grading should be taken, and Morley stated that they had bid for the work on the plans and that they should do the work by the plans. When asked if the monuments shown on the plan existed, Morley personally pointed them out to Rupp and Reif, his engineer and superintendent of construction, in the east lot line of the site. No Government representative was present. The monument at point marked 8–O was thereupon adopted by Rupp· as the bench mark or starting point for grading the large plot in front of the main building's location, as Morley requested that that area be graded first. Its top was substantially flush with the surrounding surface of the earth, and the grade elevation at the top of the monument marked on the plot plan at that point was 910.0. The claimant asserts Rupp relied on Morley pointing out this monument as the proper point from which he could take his levels and proceeded with the grading accordingly. No other bench mark or starting point was pointed out to Rupp at that time or shown anywhere on the plan. On the same plan (Exhibit H) were contour lines, and the depth of fills and excavations required was indicated in figures on these lines; but these figures were fixed on the basis of another bench mark or monument as a start-

ing point, not shown on the plans or pointed out in the specifications and unknown to Rupp, located to the south of the property site. In relation to this bench mark, the elevation of the monument at the point 8–O was 911.13. Competent engineers of many years' experience testified that they had never known of a bench mark being selected or used on building construction which was not shown on the plans. While the grading was in progress, using the monument at 8–O and grade elevation 910.0, Rupp's engineer learned that thé figures on the contour lines did not check with the grading done, but made no effort to learn why there was a discrepancy. The specifications contained a provision that contour lines and figures were not guaranteed. It was not until this grading work had progressed to a considerable extent that the general contractor fixed the floor levels of the buildings from the alleged proper bench mark, mentioned above, which had been established by the city engineer on a curbstone of one of the city streets outside the property lines, and thus Rupp did not have these levels by which to check. After the grading had all been done on the plot in question, Rupp started, in April, 1933, to lay out the grades for certain of the roads and then first learned that the grading already done was uniformly too high by about 14 inches, according to the floor levels fixed by reference to the city engineer's bench mark. The Government refused to accept the work, required that the levels be lowered, and refused to make any allowance for doing the work. To comply with the Government's requirements, it was necessary to remove the topsoil already placed, regrade the whole plot, and replace the topsoil. Morley refused to stand the cost. The work, however, had to be done before Government approval could be secured. Rupp was required by his contract to proceed with his work and settle disputes later.

 It would be impossible to further review in detail the voluminous testimony taken in connection with the questions of responsibility for the mistake and liability for the expense of regrading, within the limits of this decision. It has all been carefully read and considered. The weight of the credible evidence indicates that the necessity for regrading was due to Morley's mistake in fixing the monument at station 8–O, for which the incorrect eleva-

tion of 910.0 was shown on the plan, as the base point from which grading was to be done; that Rupp had a right to rely upon that point so fixed by Morley as the correct point and as indicated on the plans furnished him, in the absence of information to the contrary, and to proceed accordingly; that he was not guilty of negligence in failing to take steps to determine any other starting point after Morley had fixed that point and the plans showed it; and that he was not required to regrade at his own expense. He is entitled to recover from defendants the fair and reasonable value of the work so required to be done by the Government to comply with the contract, which I find, upon the evidence of Reif and Straley, who substantially agree, to be $10,350.29. This sum was due from Morley prior to the time Rupp quit the job.

(4) Defendants are not entitled to recover anything by way of liquidated damages for delay in performance on the part of Rupp or for failure to complete his contract within the time limit. Judge Knight struck out, on motion, their counterclaim and offset for delay, and by that decision we are here bound. By the terms of the subcontract, Rupp was required to complete the work within 240 days from the date of the contract. Thereafter the Government extended the time of completion of the general contract 65 days, and Rupp and Morley agreed that the former should have the benefit of this additional time. This made the time for completion 305 days. This expired on July 19, 1933. Rupp did not complete the contract prior to July 19, 1933. Claimant's position is that he was excused from completion because of Morley's fault, either in his failure to make payments to Rupp when due or on account of other matters. The evidence sustains his position, and it must be held that Rupp met the burden of proof required of him to show substantial performance in so far as the time limit for completion was concerned.

(5) As to hand raking. Rupp was required to hand-rake the surface after the grading had been completed. He did not do this work. Defendants claim that the reasonable cost of doing this work, which was done by Morley after Rupp quit, was $4,331.47, while claimant's evidence tends to show that its reasonable cost was $1,931.32. Defendants' figures were based on what they asserted was the actual cost as shown by the pay rolls between October 3, 1933, and October 31, 1933, aggregating $3,382.74, plus insurance of $479.31, making a total cost of $3,862.13. This is the only competent and convincing evidence on the subject. There is evidence that Morley made an effort to get others to finish the contract without success, and was compelled to do this work himself. That amount should be allowed for the work.

(6) As to items claimed for hand excavation. Defendants claim they should be allowed (1) $5,156.82 for hand excavation for piers and trenches, (2) $245.12 for excavation of catch basins, and (3) $252.99 for excavation for culverts and sewers on the ground that such work was covered by the subcontract. Evidence as to this was admitted on the question of substantial performance, the work having been done by Morley on Rupp's refusal to do it. Claimant asserts that Rupp had an oral agreement prior to the execution of the contract that he would do no hand excavation, or, in other words, that any excavation required would be done only by machine. If such an agreement was made, it was merged in the written contract. But claimant says that the written contract was modified orally to the same effect. When the question of hand excavation again came up for discussion, Rupp was excavating by machine and doing all the excavation, as he claimed, that the contract called for, and he claimed that what he did took the place of all hand excavation deemed necessary by Morley. When called upon by Morley to do hand excavation, in addition to the machine excavation already done, Rupp did the work. On May 27, 1933, Rupp wrote Morley: "In our original understanding with you, our excavating work would be strictly of a machine nature. Mr. John Reif, Reuben Rupp and myself were present at the Hotel Statler when this was agreed upon. We have lived up to the letter of this agreement and therefore I do not see how you can expect me to carry on any hand operations. If you will recall the time when you were working on the building foundations certain footings were excavated by hand by your men, so I do not see why it should crop up again." Morley not only failed to reply to this letter, but took no issue with Rupp as to the understanding, and subsequently paid Rupp for work done both before and after the date

of the letter. The work was all done prior to December, 1932. On the December 1st statement made to Rupp no mention was made by Morley of any item for hand excavation coming to him, nor was it ever mentioned by Morley in any subsequent statement or letter or by word of mouth. There is much other evidence on the subject. It all leads to the conclusion that Morley acquiesced in the alleged modification of the contract and that Rupp was not required to do any hand excavation.

■ A different question arises concerning the other items. Claimant admits that Rupp omitted to do certain excavation for catch basins, culverts, and sewers required by the contract. He claims that such omission amounted to $100, which he is willing to allow, while defendants claim that it cost Morley $500 to do this work. Morley's books, kept in regular order, show pay roll expenses for this work from May 30, 1933, to July 25, 1933, plus compensation insurance, of $498.11. I think, upon the whole case, the evidence shows that the reasonable value of the work necessarily done by Morley in connection with this excavation work was $498.11 and should be allowed.

■ (7) The claimant asserts that he is entitled to the sum of $575.60 (Exhibit WW) for extra materials, labor, and rent of crane between September 1, 1932, and November 4, 1932, inclusive. Morley claims that all of the items entering into this total arise out of work required to be done by Rupp under the terms of the contract. There is no dispute that Rupp did the work specified, furnished the materials and furnished his crane for use in the work, or as to the correctness of the items making up the total. Considerable of this work was in connection with the excavation which it was alleged Rupp was required to do under the contract, but which it is found was not required of him, where it was referred to as hand excavations around the footings. Extensive detailed testimony was taken on this item, and the evidence as a whole satisfactorily establishes that this work and the material and the use of the crane were not required by the terms of the contract and must be deemed an extra to which Rupp is entitled.

Summarizing the above in connection with the claim of Harrington as administrator, the account between the parties actually stood as follows at the time Rupp quit the job:

| | | |
|---|---|---:|
| Contract price | | $23,275.00 |
| Additions for cement | | 480.00 |
| | | 23,755.00 |
| Extras | | |
| (1) Rock Excavation | $ 1,433.58 | |
| (7) Miscellaneous extras | 575.60 | |
| (2) Removing débris | 260.00 | |
| (3) Regrading | 10,350.29 | 12,619.47 |
| | | 36,374.47 |
| Paid by Morley in cash | 10,400.00 | |
| Cement furnished | 10,323.00 | 20,723.00 |
| | | 15,651.47 |
| Deductions | | |
| (5) Hand raking, net | 3,862.13 | |
| Damage by crane | 41.50 | |
| Tree excavation | 73.60 | |
| Excavation for flagpole | 20.00 | |
| (6) Excavation for catch basins, etc. | 498.11 | 4,495.34 |
| Balance due Rupp | | $11,156.13 |

The question now arises as to whether claimant has met the burden of proof cast upon him of showing substantial performance of the contract. Otherwise he cannot recover anything. According to a statement made by Morley to Rupp (Exhibit 14) as of August 1, 1933, there was an overpayment to Rupp of $241.78, taking into consideration a deduction of 15 per cent. as provided for in the contract between Morley and the Government. If the 15 per cent. is not taken into account, Morley conceded that there was due Rupp $1,627.37. Nevertheless, the statement is inaccurate, because there had been no complete statement of adjustments of debits and credits on account of extras, and so forth. On the basis of the above statement and ignoring the 15 per cent. item which Morley was entitled to withhold until final settlement, there was due Rupp at that time $15,018.26, or, with the 15 per cent. deducted, $12,665.52, and there remained to be done on the contract the hand raking, aggregating $3,862.15. This was approximately 10 per cent. of the contract price. The last payment made to Rupp by Morley was on or about August 17, 1933, on a statement made through Rupp's attorney on August 16, 1933, in which he claimed the balance due of $4,328.67, plus the amount properly due for regrading, and no payments were made by the Maryland Casualty Company to Rupp at any time. Notwithstanding that, Rupp continued in the performance of his contract until some time in September, 1933. The evidence clearly establishes that Morley put a gang to work about October 3,

1933, on the hand raking job, and, according to the testimony of one witness, Rupp removed from the site certain dump trucks and a steam shovel on October 3, 1933. There was clearly no work actually done by Rupp after September 26, 1933, and he died October 15, 1933.

■ The petitioner alleges that he fully performed the contract, with the exception of the hand raking, which he claimed he was not required to do, but if he was required to do the hand raking under the contract he quit because Morley failed to pay him the amount due. His continuance on the work after August 16, 1933, is explained in the same letter in which he made the demand for payment, where he says that in accordance with the terms of the contract, if the balance due is not paid within three days, of the full amount due to Mr. Rupp under the contract, $2,107.54, which remains unpaid, it will be necessary for him to quit work on the job and sue for damages for breach of contract. In that letter he refers to a notice of default which Morley delivered to Rupp under date of August 15, 1933, and says: "Permit us to state that Mr. Rupp has at all times kept a sufficiency of properly skilled workmen to prosecute their work in accordance with the terms of his contract with you. They are still on the job and he intends to keep them there until the job is completed, provided you make payments in accordance with the terms of your contract. Mr. Rupp does not waive your breach by waiting three days and permitting you to get yourself out of default, but intends to avail himself of your default, if payment is not made as above set forth." There is no evidence to sustain a claim that Rupp terminated the contract or rescinded it, but the evidence is substantial and sufficient to establish that Rupp finally quit because of the failure of Morley to make payments as he was required to do under the terms of his contract. The arbitration clause of the contract is not to be invoked where the reason for failure to further perform the contract was the failure of the contractor to pay for services done and material previously furnished.

■■ It is clear that he cannot recover for any sum in this case, because there was neither complete nor substantial performance of his contract [Spence v. Ham, 163 N.Y. 220, 57 N.E. 412, 51 L.R.A. 238; Nieman-Irving & Co. v. Lazenby, 263 N.Y. 91, 188 N.E. 265; Bush v. Jones (C.C.A.) 144 F. 942, 6 L.R.A.(N.S.) 774; Turner v. Henning, 49 App.D.C. 183, 262 F. 637], unless defendant's breach exonerated Rupp from further performance after August 16, 1933. Even then, the extent of the damages and omissions, including the cost of correction of defects, must be set off against the amount coming to the claimant. Nieman-Irving & Co. v. Lazenby, supra. There was no willful failure to perform or intentional departure from the terms of the contract with reference to performance on the part of Rupp. The sole ground for refusing to further perform, on the evidence in this case, was the failure of the contractor to pay installments due. Under the authorities it seems that Rupp was justified in refusing to further perform. United States Fidelity & Guaranty Co. v. Robert Grace Contracting Co. (C.C.A.) 263 F. 283; Guerini Stone Company v. Carlin Construction Company, 248 U.S. 334, 344, 39 S.Ct. 102, 63 L.Ed. 275.

■ Judgment must therefore be directed in favor of the various claimants and against the defendants as herein indicated. Interest must also be allowed from November 13, 1933, the date of final settlement. Robinson v. United States (C.C.A.) 251 F. 461, appeal dismissed 257 U.S. 664, 42 S.Ct. 45, 66 L.Ed. 424. On the question of costs, the use plaintiff and each intervening petitioner who is successful herein is entitled to a single docket fee, plus costs and disbursements as allowable in this court on the trial of a jury case. Title Guaranty & Trust Company v. Crane Company, 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72; 28 U.S.C.A. § 572; Ex parte Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919. Where several claimants have joined in the same petition, but one docket fee is allowable, unless the clerk received payment, under some provision of law, of an additional docket fee. The clerk is directed to tax costs herein accordingly.